UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

TEXAS UJOINTS, LLC a/k/a
AUTOMOTIVE INDUSTRIAL SUPPLY CO., INC.,

        Plaintiff,

    v.                                 Case No. 13-CV-1008

DANA HOLDING CORPORATION and
DANA LIMITED,

        Defendants.

---

**DECISION AND ORDER DENYING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND GRANTING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Plaintiff Texas Ujoints, LLC, (hereinafter Plaintiff) brought this action against Defendants Dana Holding Corporation and Dana Limited (collectively, Dana), alleging that Dana violated its rights under the Texas Fair Practices of Equipment Manufacturers, Distributors, Wholesalers, and Dealers Act (the FPA), Tex. Bus. & Com. Code Ann. § 57.001 *et seq*., when Dana notified Plaintiff that it would not allow it to distribute Dana's product line. Plaintiff originally filed the action in state court, but Dana asserted diversity jurisdiction under 28 U.S.C. § 1332 and removed it to federal court. The case is currently before the Court on the parties' cross-motions for summary judgment. As explained below, Dana's motion will be denied and Plaintiff's motion for summary judgment as to liability on the FPA claim will be granted.

**BACKGROUND**

Automotive Industrial Supply Co., Inc. ("AISCO") is a Texas corporation that formerly conducted business in Forth Worth, Texas. The company, which traces its lineage back to 1927,

sold automotive parts and industrial drive shafts. In 1958, AISCO was acquired by Duncan Stoddard and two other investors. Gary Stoddard, Duncan's son, eventually became sole owner of AISCO.

At some time after 1962, AISCO began using the trade name "Texas Ujoints." At one time, AISCO identified Texas Ujoints as a division of AISCO. AISCO used the two names, AISCO and Texas Ujoints, to inform members of the public that it sold both automotive parts and industrial drive shafts. Over the years, AISCO distributed a number of manufacturer's products, including general automotive parts, automotive drive lines, and drive lines for heavy duty applications. In the late 1960s AISCO began distributing "GWB" brand drivelines which are manufactured in Germany.

Dana acquired the GWB product line in 2000. Dana's GWB products consist of heavy duty industrial drive lines and universal joints used in multiple industries including marine, scrap, fracking and oil drilling. For the three years prior to 2012, AISCO's purchases of GWB products were less than $25,000. AISCO purchased only $5,272 of GWB product in 2009, none in 2010, and $18,145 in 2011.

In 2012, Wisconsin residents Daniel Zahn and Martin Brown formed DanMar Holdings, LLC for the purpose of purchasing the assets of AISCO. Zahn's and Brown's principal motivation for purchasing AISCO's assets was to acquire a right to distribute Dana's GWB products. On August 24, 2012, DanMar Holdings and AISCO executed an Asset Purchase Agreement (APA) under which DanMar acquired certain assets of AISCO, including the trade names "Automotive Industrial Supply Co., Inc." and "Texas Ujoints." Zahn and Brown shortly thereafter formed a limited liability company they named "Texas Ujoints LLC," to which DanMar transferred the assets it purchased from AISCO. DanMar Holdings LLC is the sole member of Texas Ujoints LLC.

2

Even though their principal purpose for purchasing AISCO's assets was to acquire the right to distribute GWB products, neither Zahn nor Brown contacted Dana prior to the sale and asked if it would be willing to sell its GWB products to them. In the lead-up to the sale, Zahn did seek assurance from Gary Stoddard of AISCO that their new company would be able to sell Dana's GWB products once Dana detected the change in ownership. However, Stoddard expressly declined Zahn's request that he guarantee the new company's access to GWB products for one year.

It is also noteworthy that despite Zahn's and Brown's interest in acquiring the right to distribute Dana's GWB products, the APA made no mention of Dana or GWB products. The APA provided for the transfer of any rights AISCO possessed under contracts identified on Schedule 5.08, but no Schedule 5.08 was ever completed and attached to the APA. (ECF No. 70-7 at 2.) Moreover, in Section 5.08 of the APA, AISCO represented that: "Except as disclosed on Schedule 5.08, the Seller is not a party to, or subject to: (a) any contract, arrangement or understanding, . . . other than Sales Orders and Purchase Orders (as hereinafter defined) . . . ." (*Id.* at 9.) The APA also included a provision governing "Miscellaneous Assets," however, and that provision stated that the assets purchased by DanMar included "all contract rights" and "dealer and sales representatives lists and contracts . . . ." (*Id.* at 3.)

Representatives of Dana met with Stoddard, Zahn and Brown in November 2012 to discuss AISCO's future, and although Zahn and Brown indicated they had bought Stoddard's business, it was not clear to Dana at the time that it was really dealing with a new entity. Dana's representative and Senior Manager – Aftermarket, Tom DeHaven, did make one thing clear, however. According to Stoddard, DeHaven told the new owners: "I don't care what you are going to do or how you are going to do it as long as it includes this man," pointing to Stoddard, the individual Dana was familiar

3

with. (ECF No. 73-2 at 3.) DeHaven initiated a telephone conference with Stoddard, Zahn and Brown in order to introduce them to Peter Moeller, who worked in Dana's office in Germany, and to ascertain where Plaintiff saw itself in the market. In January 2013, DeHaven sent a credit application to Stoddard, Zahn and Brown in order to assuage Dana's concerns about original AISCO's past failures to pay Dana's invoices. The ownership structure and history of Plaintiff was disclosed in the application.

According to Dana, these meetings and the parties' dealings and communications in the next several months show that Plaintiff was "auditioning" to become a distributor of Dana's GWB product line. An unspecified amount of orders were filled during this time and Dana also sent Plaintiff documents such as a price list for its products that included Dana's standard terms and conditions for distributors. DeHaven and Moeller traveled to Plaintiff's facility in April 2013 to meet Zahn. They asked for details regarding Zahn's business plan and in May 2013, Zahn sent DeHaven a PowerPoint presentation explaining his and his partners' relevant work experience and their vision for the company, including several projects relating to a maritime application for Dana's product. In the end, Dana decided it was not in their best interests to move forward with a more extensive relationship with Plaintiff and as explained in more detail below, DeHaven sent Zahn an email to that effect on June 12, 2013.

## ANALYSIS

As discussed below, both parties have moved for summary judgment on the sole remaining claim in the amended complaint. Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.

4

56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In analyzing whether a question of fact exists, a court will construe the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## I.     The Texas Fair Practices Act and the Definition of "Dealer Agreement"

The FPA covers "dealers," meaning anyone primarily engaged in the business of selling or leasing equipment or repair parts for equipment to end users of the equipment and repairing or servicing equipment, and "suppliers," meaning anyone engaged in the business of the manufacture, assembly, or wholesale distribution of equipment or repair parts. Tex. Bus. & Com. Code Ann. § 57.002(3), (20). (Dealers and suppliers may be further defined as "single-line" dealers and suppliers and subject to special provisions, but the parties ignore this distinction.) "Equipment" means "machinery, equipment, or implements or attachments to the machinery, equipment, or implements used for, or in connection with[] . . . industrial, construction, maintenance, mining, or utility activities or applications." *Id.* § 57.002(7)(A)(iv). There appears to be no dispute that Dana's products constitute equipment within the meaning of the FPA.

Under the FPA, a supplier may not terminate a dealer agreement for failing to substantially comply with the essential and reasonable terms of the dealer agreement without first giving the dealer written notice of termination at least 180 days before the effective date of termination. The notice must state all reasons constituting good cause for the termination and provide the dealer at least 60 days in which to cure any claimed deficiency; if the deficiency is cured within 60 days, the notice is void. *Id.* §§ 57.154(a)(1), 57.155(a), (c). Plaintiff claims Dana violated these provisions when it terminated the parties' relationship on June 12, 2013. (Am. Compl. ¶¶ 14, 23–25, ECF No. 36.) Dana contends that it never entered into a dealer agreement with Plaintiff, and thus denies that it

5

violated the FPA.

The parties dispute the meaning of the term "dealer agreement" under the FPA. The FPA defines a "dealer agreement" as "an oral or written agreement or arrangement, of definite or indefinite duration, between a dealer and a supplier that provides for the rights and obligations of the parties with respect to the purchase or sale of equipment or repair parts." *Id.* § 57.002(4). According to Dana, this definition requires an actual agreement. Plaintiff, on the other hand, contends that the broad definition shows the Texas legislature intended to protect more than just those dealers who had an otherwise enforceable contract. As a federal court exercising diversity jurisdiction, my task is to construe the statute as would the highest court in the State of Texas. *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002). That task is made more difficult in this case, however, because neither the parties nor the court have located any Texas case, whether from the highest or intermediate appellate courts (or federal courts applying the FPA), that has interpreted either the current or past versions of the FPA's definition of a dealer agreement.

Nevertheless, I conclude that the definition requires some sort of formal or informal agreement, though not necessarily a contract. In Texas, the objective when interpreting a statute is to determine and give effect to the legislature's intent. Texas courts thus begin with the statute itself, and look to, among other things, "the language of the statute, legislative history, the nature and object to be obtained, and the consequences that would follow from alternate constructions, even when a statute is not ambiguous on its face." *Service Life and Cas. Ins. Co. v. Montemayor*, 150 S.W.3d 649, 651 (Tex. App. 2004) (citing *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001)). To the extent Dana argues a contract is required, such a construction would be too strict given the words in the definition. Although an agreement is the "essence" of a contract, the latter

6

is generally broader than the former. *See, e.g., Laredo Hides Co., Inc. v. H & H Meat Products Co., Inc.*, 513 S.W.2d 210, 223 (Tex. App. 1974) ("The essence of a contract is an agreement."); *Wiley v. Bertelsen*, 770 S.W.2d 878, 882 (Tex. App. 1989) ("'Agreement is a broader term than the word 'contract,' and an agreement might lack an essential element of a contract."). In reaching this conclusion, I am mindful that the definition of "dealer agreement" under the FPA as it was initially enacted was substantially the same as it is now, except it covered "any oral or written *contract*." *See* 1991 Tex. Gen. Laws 700, 701 (codified at Tex. Bus. & Com. Code § 19.01(6)). Generally, a legislature does not make a change in its law for no reason.

On the other hand, to the extent Plaintiff relies on inclusion of the word "arrangement" in the definition to argue for something less than at least an informal agreement between a supplier and dealer, such a construction would be far too broad. One meaning of arrangement itself is "an informal agreement or settlement . . . ." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 64 (10th ed. 1999). Moreover, the consequences that would follow from construing a "dealer agreement" as something substantially different than an actual agreement would be extraordinary. Basically, any transaction between a supplier and dealer for covered equipment or repair parts could be called an "arrangement" giving rise to a dealer agreement under the FPA. Such a law would have a sweeping effect on ordinary commerce in Texas and would undoubtedly come as a surprise to suppliers and dealers alike.

There is no evidence that the Texas legislature intended the FPA to have such a broad effect. In fact, in its statement of findings, the legislature expressly stated that the current enactment of the FPA was necessary because the "retail distribution, sales, and rental of [covered equipment] through the use of independent dealers operating *under contract* with equipment suppliers vitally affect the

7

general economy of this state, the public interest, and the public welfare." 2011 Tex. Sess. Law Serv. 2646, 2646 (West) (emphasis added). The remaining language of the definition also makes clear that whatever an arrangement may be, to constitute a "dealer agreement" within the meaning of the FPA, it must be capable of giving rise to ongoing "rights and obligations of the parties with respect to the purchase or sale of equipment or repair parts." *Id.* § 57.002(4). Ongoing rights and obligations of dealers and suppliers do not arise from a few isolated sales. As other provisions of the FPA confirm, more is required. For example, good cause for termination is defined to include the failure of the dealer to "to substantially comply with essential and reasonable requirements imposed on the dealer under the terms of the dealer agreement, provided that such requirements are not different from requirements imposed on other similarly situated dealers either by their terms or by the manner in which they are enforced." *Id.* § 57.154(a)(1). In other words, to establish a dealer agreement with a supplier, a business must do something more than simply pay the purchase price on a few orders. There must be a formal or informal agreement—i.e., a manifestation of mutual assent by the parties, that gives rise to rights and obligations on both their parts.

## II.     Dana and AISCO's "Dealer Agreement"

Plaintiff contends that AISCO was an authorized distributor of Dana products from the late 1960s until the point in time when AISCO entered into the APA with DanMar. (Pl.'s Prop. Findings of Fact (PPFOF) ¶ 8, ECF No. 72.) Although Dana stated Plaintiff's proposed finding to that effect was "disputed," its response does not address the assertion that AISCO was an authorized distributor. Instead, Dana objects to the use of the term "authorized distributor" because it is vague, ambiguous and undefined. Dana also contends that the question of whether AISCO was an authorized distributor is irrelevant. In Dana's view the question of whether it had a dealer agreement

8

with AISCO is irrelevant because whatever its relationship was with AISCO, Plaintiff is a legally separate and distinct entity. Dana does not dispute, however, that historically AISCO purchased Dana products as part of its business.

Dana's response is insufficient to place this fact in dispute. "Authorized distributor" plainly means one who is allowed to distribute or sell another's products. Dana's own representative called AISCO an "authorized distributor." (PPFOF ¶ 30.) That meant AISCO had the right to buy and sell Dana's product. This was done according to Dana's terms and conditions, and although AISCO's business had apparently slowed down, Dana had never terminated AISCO as one of its distributors. These facts are sufficient to show a manifestation of mutual assent by Dana and AISCO for AISCO to distribute at least some of Dana's products. From the undisputed facts before me, I therefore conclude that AISCO had a dealer agreement with Dana within the meaning of the FPA at the time AISCO entered into the APA with DanMar.

Dana's real point is that Plaintiff did not acquire any rights under AISCO's dealer agreement with Dana because the APA failed to convey them to DanMar. It is to that issue that I now turn.

## III. AISCO's Right To Transfer and Good Cause For Termination

Given the fact that AISCO was an authorized distributor, the next question is whether AISCO transferred its rights under its dealer agreement with Dana to DanMar Holdings, which then conveyed those rights to Plaintiff. Dana argues the APA did not transfer AISCO's distributor rights because the section listing the contracts transferred thereunder was never completed and attached to the APA. Dana also relies on AISCO's representation in the APA that it was not subject to any contract, arrangement or understanding not listed in Schedule 5.08 other than "Purchase Orders," which Dana says the Dana-AISCO distributor agreement was not. Plaintiff responds that because

9

that agreement was oral, it would not be listed in Schedule 5.08 even if it had been completed. Instead, Plaintiff points to the "Miscellaneous Assets" portion of the APA as transferring all "dealer . . . contracts[,]" including the Dana-AISCO agreement.

It is worth reiterating that according to Plaintiff, AISCO's right to purchase Dana's product was the main reason for entering into the APA (through DanMar). Though that goal could have been more plainly stated in the APA, the description of the miscellaneous assets AISCO conveyed to DanMar appears sufficiently broad to cover whatever rights AISCO had to distribute Dana products. More importantly, however, the difficulty with Dana's argument is that it was not a party to the APA. Plaintiff claims DanMar was assigned AISCO's right to distribute Dana products under the APA. An assignment itself is a contract between an assignor and an assignee. A third party to that contract cannot assert a contract-formation defense in a suit against it by the assignee. *Quinn v. McCurdy*, 187 S.W.2d 595, 597 (Tex. App. 1945) (obligor not in position to challenge sufficiency of evidence proving assignment or challenge assignment for lack of consideration); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 324 cmt. b (1981) (assignment effective against obligor notwithstanding non-compliance with statute of frauds). Thus, to the extent Dana attacks the validity of the APA, its arguments are not ultimately persuasive. Plaintiff has pointed to a provision in the APA that can be plausibly read as assigning whatever distributor rights AISCO had, and both AISCO and DanMar appear to agree that this was the intent of the APA.

Dana also relies on the email in which Stoddard declined to guarantee to Zahn that Dana would honor Plaintiff's right to buy Dana product. Dana argues Stoddard's refusal shows that no such rights were transferred. But the argument is not persuasive for the same reason—Dana was not a party to the APA. Moreover, Stoddard's refusal does not necessarily show rights were not

10

transferred, but only that the parties acknowledged a risk that Dana would not honor them. In other words, the email simply shows that Brown and Zahn knew there was a risk that Dana would object to the transfer without its consent.

With respect to the lack of Dana's consent, Dana does not actually argue the sale was invalid for that reason. Instead, Dana argues it had good cause to terminate. Under the FPA, good cause exists if "there has been a sale or other closeout of a substantial part of the dealer's assets related to the business." Tex. Bus. & Com. Code Ann. § 57.154(a)(4). Further, a termination for this reason is valid without notice or an opportunity to cure. *Id.* § 57.155(c). Thus, even if an enforceable dealer agreement did exist at one time, Dana asserts that it had good cause to terminate the agreement without notice or right to cure when AISCO sold almost all of its assets. Of course, the problem with this argument is that Dana did not terminate the dealer agreement when it first learned of the APA. It continued to do business with Plaintiff for several months.

More importantly, I do not read § 57.154(a)(4) as allowing a supplier to effectively preclude a dealer from transferring its dealer agreement. Such a construction would run contrary to the provision governing the sale or transfer of the business of a dealer, which provides:

> If a supplier has contractual authority to approve or deny a request for the sale or transfer of a dealer's business or an equity ownership interest in the dealer's business, a dealer may request that the supplier approve or deny a request for the sale or transfer of a dealer's business or an equity ownership interest in the dealer's business to a proposed buyer or transferee. The dealer's request must be in writing and must include character references and reasonable financial, personal background, and work history information with respect to the proposed buyer or transferee.

Tex. Bus. & Com. Code Ann. § 57.102(b). This section further provides that within 60 days of receipt of such a request, the supplier must either approve the request or send a written response specifying the reasons for denial. *Id.* § 57.102(c). The supplier cannot deny the request unless the

11

proposed buyer or transferee fails to meet the supplier's reasonable requirements. *Id.* § 57.102(d). In this way, the FPA seeks to strike a balance between the policies in favor of alienability of dealer agreements and against forcing a supplier to accept as a distributor a party who lacks the qualifications to perform.

Section 57.102 does not even apply here, however, because there is no evidence that Dana retained contractual authority to approve or deny the sale of AISCO. Reading the good cause provision to allow Dana to terminate a dealer agreement whenever there has been a sale of the business would amount to granting Dana a right it not only did not reserve, but one that the FPA does not allow even when the supplier retains it by contract. In essence, § 57.102 ensures that a supplier's consent to a sale cannot be unreasonably withheld in cases in which the supplier's consent is contractually required. Where, as here, the supplier's consent is not contractually required, the necessary implication is that the dealer may freely transfer its business without such consent.

What § 57.154(a)(4) must mean, then, is that a supplier has good cause to terminate a dealer agreement where "there has been a sale or other closeout of a substantial part of the dealer's assets related to the business" without an assignment of the dealership agreement or, in cases where consent of the supplier is contractually required, the dealer has either transferred the business without notice to the supplier or the supplier's consent has been reasonably denied. Any other reading of § 57.154(a)(4) would place it in direct conflict with § 57.102. It thus follows that AISCO's sale of its assets to DanMar does not constitute grounds for terminating Dana's dealer agreement with AISCO. It also follows that AISCO was entitled under the FPA to transfer its rights under its dealer agreement with Dana to DanMar and DanMar, in turn was entitled to transfer them to Plaintiff.

12

## IV.     Statute of Frauds

Dana also argues it is entitled to summary judgment because there was no written dealer agreement at any time and therefore any alleged agreement must have been an oral one for the sale of goods barred under Texas's statute of frauds. In relevant part, Texas's statute of frauds provides that "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." Tex. Bus. & Com. Code Ann. § 2.201(a).

The statute of frauds does not apply to a claim under the FPA, however. As Plaintiff notes, the cases Dana relies on hold only that a *breach of contract* claim may be barred by the statute of frauds, not a claim arising directly under a statute like the FPA. In reply, Dana argues that "Texas law is clear that the UCC [which includes the statute of frauds] applies even when a plaintiff brings a cause of action under a separate statute." (ECF No. 83 at 10.) To the extent Dana argues the cases cited involved applying the statute of frauds (or any other UCC defense) to defeat a statutory claim, the argument is based on a misreading of the cases. In *East Hill Marine, Inc. v. Rinker Boat Co., Inc.*, for example, the court applied the statute of frauds to bar a contract claim, but the statutory claims were barred under other parts of the particular statute giving rise to the cause of action. 229 S.W.3d 813, 816–18, 819–20 (Tex. App. 2007); *accord H.W. McKinzie Co. v. Raytheon Appliances, Inc.*, No. 01-03-272-CV, 2005 WL 678858 at *6, 8 (Tex. App. Mar. 24, 2005).

Applying the statute of frauds' writing requirement to a claim under the FPA would also undermine the legislature's clear intent to protect written *and oral* dealer agreements. Tex. Bus. &

Com. Code Ann. § 57.002(4). The same point has been made with respect to Wisconsin's fair dealership law. *See* MICHAEL A. BOWEN ET AL., THE WISCONSIN FAIR DEALERSHIP LAW § 4.19 (4th ed. 2012) ("Grantors have argued . . . if a dealership agreement is unwritten, it is unenforceable under . . . the statute-of-frauds . . . . This argument has yet to succeed."). Texas's sales code itself limits its scope, including the statute of frauds, by expressly providing that nothing in it "impair[s] or repeal[s] any statute regulating sales to consumers, farmers or other specified classes of buyers." Tex. Bus. & Com. Code Ann. § 2.102. If a distributorship agreement is a contract for the sale of goods, than the FPA would appear to be a statute regulating sales to a specific class of buyers—distributors. In any event, Dana has not provided any case, and the court had found none, in which a court applied the statute of frauds to bar a claim arising under a statute, rather than one for breach of contract. Accordingly, Dana is not entitled to summary judgment under the statute of frauds.

## V. Termination

The last issue is whether Dana's termination of its relationship with Plaintiff violated the FPA. Dana's Tom DeHaven emailed Texas Ujoints' Dan Zahn on June 12, 2013 and advised that Dana "decided not to directly distribute the GWB product" to Plaintiff. No reason was stated in the email. DeHaven merely offered to put Zahn in touch with one of Dana's GWB distributors. (ECF No. 73-15 at 1.) DeHaven testified that the decision was made after Dana representatives "deemed that this relationship . . . was not going to be going any further" and "just didn't feel that [Texas Ujoints] would be a good fit for the distribution of the product [or 'a good fit for the market']." (ECF No. 73-1 at 22, 23.) DeHaven also explained that during the time that he considered Dana to be contemplating whether to enter into a longer term relationship with Plaintiff, he had told Zahn that

14

Dana "needed to see a game plan on how he was going to enter the market and support new customers" and that Zahn just "didn't give me [DaHaven] enough. He gave me minimal information." (ECF No. 76-4 at 54.)

This may have been a reasonable business decision at the time it was made, considering Dana's view that Plaintiff was not yet an authorized distributor. But as explained above, Plaintiff acquired AISCO's distributorship rights by transfer and none of the reasons provided by DeHaven, or otherwise by Dana, constitute good cause under the FPA. Dana did not provide the required notice and opportunity to cure. Accordingly, Dana violated §§ 57.153 and 57.155 by terminating its dealer agreement with Plaintiff. Dana did provide an additional 30-days of purchasing authority after June 12, 2013 based on Zahn's representation that Plaintiff had an existing customer order; perhaps that is relevant to damages. But as to liability, Dana terminated without cause and therefore Plaintiff is entitled to summary judgment on the remaining claim in the amended complaint.

## CONCLUSION

For the foregoing reasons, Dana's motion for summary judgment is denied and Plaintiff's motion for summary judgment as to liability is granted. The Clerk is directed to set this matter on the court's calender for a telephone scheduling conference.

Dated this  30th  day of May, 2015.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

15